United States District Court
Southern District of Texas

**ENTERED**

August 24, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | CRIMINAL NUMBER H-17-290-01 |
| v. | § | (CIVIL ACTION NO. H-23-0109) |
| | § | |
| HARCHARAN SINGH NARANG, | § | |
| | § | |
| Defendant-Petitioner. | § | |

## MEMORANDUM OPINION AND ORDER

Dr. Harcharan Singh Narang ("Petitioner") was convicted of health care fraud, conspiracy to commit health care fraud, and money laundering in this court on February 22, 2019. Following the conclusion of his direct appeal, Petitioner has filed a Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody ("Petitioner's § 2255 Motion") (Docket Entry No. 427). Petitioner argues that the United States ("the Government") improperly mentioned his codefendant's guilty plea at trial, that his trial counsel was ineffective, that the government engaged in misconduct at trial and sentencing, and that cumulative error made his trial and sentencing fundamentally unfair. Petitioner asks the court to vacate his conviction and sentence. For the reasons explained below, Petitioner's § 2255 Motion will be denied.

## I. Background

Petitioner and codefendants Dr. Gurnaib Singh Sidhu and Dayakar Moparty were indicted on May 17, 2017, on one count of

conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 and seventeen counts of health care fraud in violation of 18 U.S.C. § 1347.[1]  Petitioner and Moparty were charged with three counts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.[2] The Indictment alleged that Petitioner and Dr. Sidhu "were medical doctors and partners in a medical practice named North Cypress Clinical Associates ('North Cypress')."[3]  Petitioner "was the registered agent for Forever Fit, a weight loss business located at the offices of North Cypress."[4]  The Indictment alleged that Sidhu "signed an agreement . . . to serve as a Medical Director for Red Oak [Hospital]," a hospital that "allegedly subleased space at North Cypress to perform diagnostic tests for patients."[5]  "Forever Fit sold coupons for weight loss injections on a web site named Groupon.  Forever Fit customers went to North Cypress to redeem the coupons and were seen by either [Petitioner] or Sidhu."[6] Petitioner "and/or Sidhu authorized [codefendant] Moparty to bill for medical tests such as allergy tests, ultrasounds, EKGs, nerve

---

[1]Indictment, Docket Entry No. 1, pp. 5, 16-19.  For purposes of identification all page numbers reference the pagination imprinted at the top of the page by the court's Electronic Case Filing ("ECF") system.

[2]Id. at 19-20.

[3]Id. at 6 ¶ 1.

[4]Id. ¶ 2.

[5]Id. at 7 ¶ 5, 6 ¶ 4.

[6]Id. at 7 ¶ 6.

conduction[] tests and vestibular testing that were not medically necessary, not provided, or both" for North Cypress patients.[7] Moparty billed private insurance companies over $20 million and received $3.2 million.[8]  The Indictment alleged three transactions where Moparty transferred money derived from the health care fraud to Petitioner and his wife.[9]

Soon after his initial arraignment, Sidhu was granted pretrial release on May 24, 2017.[10]  On July 9, 2018, the Government filed a motion to revoke Sidhu's bond.[11]  The Government alleged that Sidhu had committed health care fraud while on bond by prescribing millions of dollars of topical creams to patients, frequently without an office visit.[12]  On September 18, 2018, the court signed an agreed order adding conditions to Sidhu's pretrial release.[13] Sidhu was prohibited from writing any further prescriptions or making referrals, but his bond was not revoked.[14]  On December 11,

---

[7]Id. ¶ 8.

[8]Id. at 8 ¶ 15.

[9]Id. at 19-20.

[10]Order Setting Conditions of Release, Docket Entry No. 13, p. 1.

[11]United States Motion to Revoke Defendant Sidhu's Appearance Bond, Docket Entry No. 62, p. 4.

[12]Id. at 2.

[13]Agreed Order Modifying Conditions of Release, Docket Entry No. 76.

[14]Id.

2018, Sidhu pled guilty to one count of conspiracy to commit health
care fraud pursuant to a plea agreement.[15]  Under the Agreement, the
Government agreed to dismiss the remaining counts, to not oppose
Sidhu's request for acceptance of responsibility adjustment at
sentencing, and that the loss allocable to Sidhu was $600,000.[16]
The Government also agreed to not further prosecute Sidhu "for
offenses arising from conduct charged in the Indictment or for any
other conduct about which [the Government is] aware at the time
defendant enters his guilty plea."[17]

The Government moved to take Sidhu's deposition for use at
trial because he had liver cancer with a "tenuous" prognosis and
because his testimony was "'at the very core of the issues in the
indictment.'"[18]  The court allowed the deposition.[19]  At his
deposition, Sidhu testified that he ordered tests that "I don't
think that should [have] ever [been] done with the weight loss
patients."[20]  Sidhu confirmed that Petitioner told him "to order

---

[15]Plea Agreement, Docket Entry No. 99, pp. 1, 11.

[16]Id. at 4.

[17]Id. at 4-5.

[18]Motion Under Fed. R. Crim P. 15 to Preserve the Testimony of
Dr. Gurnaib Sidhu, Docket Entry No. 95, pp. 1-2 (quoting
United States v. Drogoul, 1 F.3d 1546, 1554 (11th Cir. 1993)).

[19]Order, Docket Entry No. 96.

[20]Oral and Videotaped Deposition of Gurnaib Singh Sidhu, M.D.
("Sidhu Depo."), Exhibit A to Memorandum in Support of Motion to
Vacate, Set Aside, or Correct a Sentence By a Person in Federal
Custody ("Petitioner's § 2255 Memorandum"), Docket Entry No. 428-1,
p. 31 lines 7-12.

tests that [Sidhu] felt were not necessary."[21] Sidhu followed Petitioner's orders "[b]ecause [he was] an employee" of Petitioner.[22] Although Petitioner's trial counsel cross-examined Sidhu, the deposition was ended early in part due to trouble understanding Sidhu.[23] Petitioner states that the deposition was rescheduled, postponed due to a government shutdown, and ultimately abandoned.[24] The Government told Petitioner's attorney that they would instead call Sidhu at trial.[25] Ultimately the Government stated after the start of trial that it would not call Sidhu as a witness.[26] Petitioner's trial counsel did not seek to call Sidhu.

Petitioner and Moparty went to trial. The Government stated in its opening argument that "you will also hear that Dr. Sidhu is not in this trial because he has already pled guilty."[27] Petitioner made no objection to this statement.[28]

The Government called witnesses who testified that they had bought Groupons for weight loss shots online and made appointments

---

[21]Id. at 32 lines 21-25.

[22]Id. at 33 lines 3-10.

[23]Id. at 133 lines 12-25.

[24]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 18.

[25]Id.

[26]Id.

[27]Day 1 of 8 Transcript of Trial Before the Honorable Sim Lake ("Day 1 Trial Transcript"), Docket Entry No. 219, p. 66 lines 22-24.

[28]Id.

-5-

at North Cypress Medical Center with Petitioner.[29] After consulting about weight loss, Petitioner would obtain permission to conduct tests, even though the patients had not complained of related symptoms.[30]

The Government put on four medical expert witnesses who testified that many of the tests were not medically necessary. Dr. Richard Gans, the director of a dizziness, vertigo, and balance clinic, testified regarding various vestibular tests billed by Petitioner.[31] He testified that the test reports were not uploaded to the patient's charts and that the tests were performed in ways that made them unreliable or worthless.[32] Dr. Rubina Wahid, an allergy and immunology specialist, testified that Petitioner's allergy tests were below the standard of care, incoherently recorded, not communicated to patients, and performed without obtaining detailed patient history.[33] Dr. Peter Grant, an expert in electrodiagnostic medicine, testified that most of the nerve

---

[29]E.g., id. at 92 lines 9-10, 93 lines 4-10, 94 lines 10-13, 95 lines 1-12.

[30]Id. at 97 lines 21-25, 98 lines 1-25, 99 lines 1-7.

[31]Day 2 of 8 Transcript of Trial Before the Honorable Sim Lake ("Day 2 Trial Transcript"), Docket Entry No. 220, pp. 79 lines 3-18, 80 lines 17-22, 82 lines 13-25.

[32]Id. at 83 lines 19-20, 88 lines 12-20.

[33]Day 3 of 8 Transcript of Trial Before the Honorable Sim Lake ("Day 3 Trial Transcript"), Docket Entry No. 222, pp. 152 lines 7-16; 157 lines 1-19, 163 lines 18-24, 164 lines 1-12, 166 lines 9-20, 167 lines 20-23.

conduction tests were medically unnecessary and so filled with errors as to be clinically worthless.[34]   Dr. Michael Bungo, a cardiologist, testified that the forty patient files he reviewed showed nearly identical sets of symptoms, which he characterized as "so medically improbable that it bordered on impossible."[35]   The Government called Dr. Aditya Samal, a cardiologist, as a fact witness.   In 2013 Petitioner contacted Samal and reached an agreement that Samal would review echocardiograms and vascular tests performed by Petitioner's office for $35 per test.   Samal testified that the quality of Petitioner's tests "was not very good" and that "most of the studies were not appropriate."[36]

The Government called Keon Warren, a billing director for Moparty.[37]   Insurance carriers will often pay a higher rate for a service when it is performed at a hospital as opposed to a clinic, especially if performed out-of-network.[38]   Warren explained that Red Oak Hospital billed services as out-of-network hospital services

---

[34]Day 4 of 8 Transcript of Trial Before the Honorable Sim Lake ("Day 4 Trial Transcript"), Docket Entry No. 225, pp. 154 lines 15-25, 160 lines 12-25, 161 lines 1-7, 23-25.

[35]Day 5 of 8 Transcript of Trial Before the Honorable Sim Lake ("Day 5 Trial Transcript"), Docket Entry No. 228, pp. 5 lines 1-7, 6 lines 6-10, 7 lines 16-23, 8 lines 1-7.

[36]Id. at 185 lines 7-9, 186 lines 9-14, 188 lines 5-9.

[37]Id. at 214 lines 17-25.

[38]Day 4 Trial Transcript, Docket Entry No. 225, pp. 73-74.

even though they were performed at Petitioner's North Cypress (non-hospital) office.[39]

The Government called Special Agent Kevin Lammons, an FBI agent with experience in health care fraud who investigated Petitioner and Moparty.[40]  Lammons testified how most of the insurance reimbursements for services billed through Red Oak Hospital (and other hospital entities controlled by Moparty) were ultimately transferred to entities controlled by Petitioner or his wife.[41]  During Lammons' testimony, the Government also asked him about Sidhu:

> Q:    Okay.  And we haven't talked a lot about Dr. Sidhu yet.  We've heard that he was working with Dr. Narang but haven't seen him in this trial.  Why is that?
>
> A:    He's already pled guilty.[42]

Counsel for Petitioner and Moparty both objected, and the court immediately gave a limiting instruction:

> Dr. Sidhu is not here.  He did plead guilty.  The fact that he's guilty is not evidence that any other person is

---

[39]Day 5 Trial Transcript, Docket Entry No. 228, p. 240 lines 10-21. Also relevant to this part of the scheme was patient testimony that they never went to Red Oak Hospital and saw nothing related to Red Oak Hospital at Petitioner's office, and testimony by insurance company representatives explaining the importance of billing services based on the correct location (such as hospital vs. non-hospital).

[40]Day 6 of 8 Transcript of Trial Before the Honorable Sim Lake ("Day 6 Trial Transcript"), Docket Entry No. 230, pp. 54 lines 7-12, 55 lines 5-8.

[41]Id. at 144 lines 16-24.

[42]Id. at 83 lines 13-16.

-8-

guilty of any wrongdoing. His case was considered separately, and you're not to draw any adverse inference from the fact that Dr. Sidhu may believe he is guilty. It's not relevant to this case. These defendants are presumed to be innocent. The fact that somebody else may be guilty does not in any way affect the presumption of innocence that cloaks them and remains with them until such time, if ever, that the government can prove these defendants guilty of anything.[43]

The court gave the jury a similar instruction at the close of the evidence.[44]

After the Government rested, both defendants moved for mistrials, arguing that the references to Sidhu's guilty plea were improper, deliberate, and prejudicial to the defendants.[45] The court took the motions under advisement.[46]

The jury convicted Petitioner on all counts.[47]

The court denied the defendants' motion for a mistrial, emphasizing that the defendants did not object to the first reference to Sidhu's guilty plea and that the court instructed the jury to disregard Sidhu's guilty plea after the second reference.[48]

---

[43]Id. at 83 lines 17-25, 84 lines 1-9.

[44]Day 7 of 8 Transcript of Trial Before the Honorable Sim Lake ("Day 7 Trial Transcript"), Docket Entry No. 209, pp. 165 lines 23-25, 166 lines 1-7.

[45]Day 6 Trial Transcript, Docket Entry No. 230, p. 220 lines 3, 16-20; Defendants' Motion for Mistrial with Memorandum in Support, Docket Entry No. 179, pp. 1-2.

[46]Day 6 Trial Transcript, Docket Entry No. 230, p. 220 lines 21-22.

[47]Verdict, Docket Entry No. 167, pp. 1-6.

[48]Memorandum Opinion and Order, Docket Entry No. 234, pp. 3, 15.

-9-

The court sentenced Petitioner to 121 months in prison, the low end of the guidelines range.[49]

On appeal Petitioner complained of the court's denial of his motion for a mistrial, again arguing that the government improperly mentioned Sidhu's guilty plea.[50]   The Fifth Circuit considered whether the guilty plea references violated Petitioner's right "to have questions of guilt based on the evidence against them, not on whether a government witness or a codefendant has plead[ed] guilty to the same charge." Moparty, 11 F.4th at 292.   The Fifth Circuit analyzed the relevant factors and held that the court did not abuse its discretion by denying the mistrial motion.  Id. at 293.   The Fifth Circuit also rejected Petitioner's argument that the references violated the Confrontation Clause.  Id. n.18.  Petitioner also argued that this court had shifted the burden of proof onto Petitioner when it stated—in response to the Confrontation Clause objection—that Petitioner could subpoena Sidhu to testify.  Id. The Fifth Circuit also rejected this argument.  Id.

Petitioner's § 2255 Motion was timely filed on January 2, 2023; the Government responded on April 18, 2023; and Petitioner replied on June 28, 2023.[51]  Petitioner renews his challenge to the

---

[49]Hearing on Sentencing Before the Honorable Sim Lake ("Sentencing Transcript"), Docket Entry No. 318, pp. 25 lines 12-19, 50 lines 19-24.

[50]United States v. Moparty, 11 F.4th 280, 291-93 (5th Cir. 2021).   Petitioner and Mr. Moparty appealed six other issues not relevant to Petitioner's § 2255 Motion.  See id. at 291.

[51]Petitioner's § 2255 Memorandum, Docket Entry No. 428; United States' Opposition to and Request for Denial of 28 U.S.C.
(continued...)

-10-

references to Sidhu's guilty plea and to the court's statement that he could call Sidhu as a witness.[52]  Petitioner also argues that his trial counsel was ineffective by failing to call various witnesses and for inadequately cross-examining Lammons.[53]  Petitioner argues that the Government committed misconduct by intentionally causing Sidhu's unavailability at trial and by making an improper statement at sentencing.[54]  Petitioner also argues that cumulative error made his trial and sentencing fundamentally unfair.[55]

## II.  Legal Standard

### A.  Title 28 U.S.C. § 2255

28 U.S.C. § 2255(a) states that a prisoner sentenced by a federal court may move that court "to vacate, set aside or correct the sentence" "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack."  "A defendant can challenge a final conviction, but only on issues of constitutional or jurisdictional magnitude."  United States v. Willis, 273 F.3d

---

[51](...continued)
§ 2255 Motion ("Government's Response"), Docket Entry No. 436; Reply to United States' Opposition to and Request for Denial of 28 U.S.C. § 2255 Motion ("Petitioner's Reply"), Docket Entry No. 441.

[52]Petitioner's § 2255 Memorandum, Docket Entry No. 428, pp. 4-5.

[53]Id. at 24, 26, 27, 30.

[54]Id. at 31, 32.

[55]Id. at 33.

592, 595 (5th Cir. 2001).   "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." <u>United States v. Frady,</u> 102 S. Ct. 1584, 1593 (1982).

The court "may not consider an issue disposed of in [the defendant's] previous appeal at the § 2255 stage." <u>United States v. Goudeau,</u> 512 F. App'x 390, 393 (5th Cir. 2013).   Similarly, a defendant generally may not raise claims in a § 2255 motion that he has procedurally defaulted. <u>United States v. Vargas-Soto,</u> 35 F.4th 979, 993 (5th Cir. 2022).   "In general, [i]t is well settled that where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a § 2255 motion only if the petitioner can first demonstrate either (1) cause and prejudice, or (2) that he is 'actually innocent' of the crime for which he was convicted." <u>United States v. Torres,</u> 163 F.3d 909, 911 (5th Cir. 1999) (internal quotation marks omitted).   To show cause, "the movant 'must show that some objective factor external to the defense impeded counsel's efforts to comply with the [relevant] procedural rule.'" <u>Vargas-Soto,</u> 35 F.4th at 993 (quoting <u>Davila v. Davis,</u> 137 S. Ct. 2058, 2065 (2017)).

A court must grant an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."   28 U.S.C. § 2255(b).   "When facts are at issue in a § 2255 proceeding,

-12-

a hearing is required if (1) the record, as supplemented by the trial court's personal knowledge or recollection, does not conclusively negate the facts alleged in support of the claim for § 2255 relief, and (2) the movant would be entitled to postconviction relief as a legal matter if his factual allegations are true." United States v. Anderson, 832 F. App'x 284, 287 (5th Cir. 2020). A petitioner's "conclusory assertions do not support the request for an evidentiary hearing." United States v. Auten, 632 F.2d 478, 480 (5th Cir. 1980). Instead, a petitioner must produce "independent indicia of the likely merit of her allegations, typically in the form of one or more affidavits from reliable third parties." United States v. Cervantes, 132 F.3d 1106, 1110 (5th Cir. 1998); United States v. Edwards, 442 F.3d 258, 264 (5th Cir. 2006).

## B.    Ineffective Assistance of Counsel

"A claim for ineffective assistance of counsel is properly made in a § 2255 motion because it raises an issue of constitutional magnitude and, as a general rule, cannot be raised on direct appeal." United States v. Conley, 349 F.3d 837, 839 n.1 (5th Cir. 2003) (internal quotation marks omitted). To prevail on an ineffective assistance of counsel claim, a convicted defendant must show (1) that defense counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. Strickland v. Washington, 104 S. Ct. 2052, 2064 (1984).

-13-

Performance is deficient if the defendant's lawyer "made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 2065. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 2066.

To show prejudice a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 2068. For a trial error, the defendant must show that counsel's errors were "'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Harrington v. Richter, 131 S. Ct. 770, 788-89 (2011). For a federal sentencing error, the defendant must show a reasonable probability that he would have received a lesser sentence but for counsel's error, but "any amount of actual jail time . . . constitutes prejudice for purposes of the Strickland test." United States v. Grammas, 376 F.3d 433, 436 (5th Cir. 2004) (internal quotation marks omitted).

## III. **Analysis**

### A. **References to Sidhu's Guilty Plea**

Petitioner argues that his conviction and sentence must be vacated because the government impermissibly referred to

-14-

Dr. Sidhu's guilty plea, violating <u>United States v. Delgado</u>, 401 F.3d 290 (5th Cir. 2005) and similar cases.[56] He also argues that the references violated the Confrontation Clause and that this court, while addressing his Confrontation Clause objection during trial, shifted the burden of proof to him.[57] Because the Fifth Circuit rejected these arguments on direct appeal, the court may not consider them in a § 2255 motion. Petitioner argues that the Fifth Circuit's opinion was "limited to the scope of an evidentiary issue, rather than the constitutional claims raised herein."[58] But the Fifth Circuit rejected both the confrontation clause argument and the argument that the court implied that Petitioner had an evidentiary burden. <u>See Moparty</u>, 11 F.4th at 293 n.18.

## B. Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was constitutionally ineffective in four ways. First, he argues that counsel should have subpoenaed Sidhu as a trial witness. Second, he argues that counsel should have called ten of his patients who were willing to testify favorably about Petitioner's care. Third, he argues that counsel should have called an expert witness to testify that his tests were medically necessary. Finally, he argues that counsel's cross-examination of Agent Lammons was insufficient. The

---

[56]Petitioner's § 2255 Memorandum, Docket Entry No. 428, pp. 4, 6.

[57]<u>Id.</u> at 5.

[58]<u>Id.</u> at 21.

Government argues that each of these decisions was reasonable trial strategy and that Petitioner cannot show prejudice.

### 1.   Trial Counsel's Decision to Not Call Sidhu

Petitioner argues that it was unreasonable for his trial counsel to not call Sidhu as a witness.  He argues that this was an error because Sidhu's deposition made it clear that his testimony would undermine the Government's case.[59]  Petitioner argues that he was prejudiced because the jury would not have convicted him if it had heard Sidhu's favorable testimony.

In arguing that Sidhu would have been a favorable defense witness, Petitioner asserts that Sidhu made a number of helpful statements in his deposition.  First, Petitioner claims that "Sidhu admitted being a medical director for Red Oak Hospital and confirmed his signature on the medical director contract during his previous interview."[60]  Petitioner does not provide a citation.  But Sidhu testified in his deposition that the signature on the medical director contract was not his, denied multiple times that he was ever a medical director for Red Oak, and testified that he had never done any work at Red Oak.[61]  Petitioner asserts that Sidhu

---

[59]Id. at 14, 24-25.

[60]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 14.

[61]Sidhu Depo., Exhibit A to Petitioner's § 2255 Memorandum, Docket Entry No. 428-1, pp. 18 lines 13-15, 19 lines 3-7, 20 lines 12-25, 21 lines 1-12.

"acknowledged that he would order tests as he saw medically necessary."[62] Petitioner cites this portion of Sidhu's deposition:

> Q:   Dr. Sidhu, after the arrangement with Red Oak ended, you continued to order the same types of tests for most of the patients that you had in the beginning, correct?
>
> A:   What I was thinking good for me, I ordered those tests.[63]

Petitioner asserts that Sidhu stated that he ordered tests based on patients' medical condition and according to his medical education as a "trained clinician."[64]  These are the relevant deposition exchanges:

> Q:   . . . You don't just order tests blindly for patients, do you?
>
> A:   We order few tests which is very important for the primary care doctors, especially echo, the VP, I've done an ultrasounds of jugulars, and these are the main things that we do for the ultrasound.  If patient is diabetic and they complain of numbness and other things, then we do another study, and these are the main tests that was ordered, but other than that, if it's an allergy or vision or patient is becoming ill, they are dizzy and all this, then we may order the other tests.
>
> Q:   So let me follow up on that answer.  If I'm a patient and I come in to see a physician and I'm a new patient, there are certain things that are required of me which are standard; would you agree, that the medical office will want from me?  They will want to know, for example, what's my history?

---

[62]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 14.

[63]Sidhu Depo., Exhibit A to Petitioner's § 2255 Memorandum, Docket Entry No. 428-1, p. 87 lines 12-17.

[64]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 15.

A:    Yeah, history.[65]

. . .

Q:    Okay. Very good. So part of what you do as a
      trained clinician is you need to gather information
      from the patient, correct?

A:    Yes. Typical, yes.[66]

. . .

Q:    Okay. And so ordering tests for patients is a
      normal and necessary thing in medical practice?

A:    Yeah. Just I told you that some of those tests,
      definitely they are.[67]

. . .

Q:    And in medical school, you are taught to order lots
      of tests to try to find out what is going on?

A:    Yes, sir.[68]

Petitioner next asserts that "contrary to the Government's

contention that the scheme was 'exactly' 'Groupons . . . placed for

weight loss shots' . . . Dr. Sidhu stated that [Petitioner's]

practice did not solely consist of patients who had come to the

Forever Fit with a groupon, and that they 'were getting some other

patients too' . . . Dr. Sidhu also acknowledged that there was a

normal, established practice that had nothing to do with weight

---

[65]Sidhu Depo., Exhibit A to Petitioner's § 2255 Memorandum,
Docket Entry No. 428-1, p. 69 lines 16-25, 70 lines 1-8.

[66]Id. at 70 lines 22-25.

[67]Id. at 71 lines 19-22.

[68]Id. at 72 lines 7-9.

-18-

565a736cb4b7fe3d

loss."[69]    Lastly, Petitioner points to Sidhu's statement that patients were free to get the recommended tests done elsewhere if they chose to.[70]

The cited testimony may have provided some value for Petitioner. But it must be considered with the rest of Sidhu's statements. As quoted supra at fn. 20-22, Sidhu confirmed multiple times a key fact underpinning the charges — that he ordered medically unnecessary tests at the direction of Petitioner. Petitioner's counsel had to weigh this specific and harmful testimony against Sidhu's generic statements about his general approach to ordering tests and his statement that Petitioner had some patients unrelated to the weight loss business. Courts must afford great deference to defense counsel's strategic decisions. Strickland, 104 S. Ct. at 2066. "[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy." United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983); see also Matos v. Stephens, Civil Action No. 4:13-343, 2014 WL 645356, at *10 (S.D. Tex. Feb. 19, 2014) ("The decision of which witnesses to call at trial is especially entitled to deference under Strickland . . ."). Defense counsel had ample reasons to conclude that calling Sidhu as

---

[69]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 16.

[70]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 16; Sidhu Depo., Exhibit A to Petitioner's § 2255 Memorandum, Docket Entry No. 428-1, p. 74 lines 7-9.

a witness would be detrimental to Petitioner's defense.   This
decision was not ineffective assistance.

### 2.   Counsel's Decision to Not Call Patients as Witnesses

Petitioner next argues that his trial counsel was ineffective
by not calling any of Petitioner's patients as witnesses.
Petitioner states that he "provided his trial attorney with a list
of approximately ten patients . . . [who] would testify that the
testing was done with their consent, properly administered, and
appropriate treatment plans were discussed between [Petitioner]'s
clinic and them."[71]

Petitioner does not identify any of these patients or explain
how he knows their likely testimony.   More importantly, this
testimony would be of limited relevance because the fact that some
patients did not receive unnecessary tests does very little to
negate the fact that others did.[72]   Petitioner is far from
overcoming the "strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance."
Strickland, 104 S. Ct. at 2065.

---

[71]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 26.

[72]See United States v. Lee, 966 F.3d 310, 323 (5th Cir. 2020)
("To convict Taylor and Lee, the government had to show only that
the couple conspired to distribute some controlled substances
outside the scope of professional practice.   See [United States v.
Evans, 892 F.3d 692, 707 (5th Cir. 2018)] (explaining that a
doctor's abiding by the standard of care for some patients was
'irrelevant' to the charged conduct of unlawfully distributing
controlled substances to three other patients).").

3.   Counsel's Decision to Not Call an Expert Witness

Petitioner next argues that his trial counsel was ineffective for failing to call an expert witness to testify on medical necessity.  Petitioner argues that "[t]here is no doubt that this case involves complex medical issues, which required medical experts to testify."[73]  Petitioner identifies Dr. Ashok Kadambi, an internist and endocrinologist, who testified at Petitioner's sentencing on the issue of financial loss by defending the medical necessity of Petitioner's tests.[74]  To do so, Kadambi reviewed 207 patient charts and underlying files from Petitioner's patients. Kadambi testified that he "did not find any instance where a particular test was not indicated or was not necessary."[75]  Kadambi prepared a table of his findings with comments explaining why he believed each test was appropriate based on the patient's file.[76] Kadambi also stated that a doctor treating weight loss might order food allergy tests because "certain food allergies [such as gluten] are very intricately tied to weight issues."[77]   He stated that it

---

[73]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 27.

[74]Sentencing Transcript, Docket Entry No. 318, p. 7 lines 11-13.

[75]Id. at 13 lines 17-19.

[76]Id. at 13 lines 20-25; September 27, 2019, Correspondence, Exhibit 3 to Defendant's Supplemental Objections to the Presentence Investigation Report's Loss Calculations, Docket Entry No. 258-3, pp. 8-20.

[77]Sentencing Transcript, Docket Entry No. 318, p. 16 lines 18-19.

-21-

is important to take EKGs of patients before prescribing amphetamines for weight loss.[78]  Kadambi also opined generally that Petitioner appeared to run "a proactive practice," meaning Petitioner would seek to "anticipate a problem and prevent a problem from happening rather than wait for the problem to happen and then try to fix it."[79]  Kadambi stated that to an internist who does not take this proactive approach to medicine, "it may appear to that particular internist that too many tests are being ordered. But, as a matter of fact, the tests that are being ordered are assessing problems before they arise."[80]  Kadambi did not opine "on whether the tests were performed properly," "whether they were done with the proper technician," or "whether or not the tests were interpreted properly."[81]

        i.   Counsel's Performance

The Government argues that "[t]he hiring of expert witnesses and the presentation of their testimony [is] a matter of trial strategy,"[82] but the Government does not substantively respond to

_____

   [78]Id. at 17 lines 10-18, 18 lines 3-5.

   [79]Id. at 11 lines 20-21, 12 lines 8-10.

   [80]Id. at 15 lines 22-25, 16 lines 1-2.

   [81]Id. at 15 lines 5-16.

   [82]Government's Response, Docket Entry No. 436, pp. 17-18 (citing Colburn v. Cockrell, 37 F. App'x 90, *11 (5th Cir. 2002)). The Government also argues that Petitioner must "'name the witness, demonstrate the witness was available to testify and would have done so, set out the content of the witness's proposed testimony,
                                                    (continued...)

the argument that the decision amounted to deficient performance. The Government offered extensive and credible expert testimony that severely attacked the basis for many of the ordered tests, and it may not have been wise for Petitioner's trial counsel to leave that expert testimony largely unrebutted. In any event, the court need not definitively resolve whether this amounted to deficient performance because Petitioner has not established prejudice.

ii.  Prejudice

Although the Government does not address whether declining to call an expert witness was prejudicial, the court must nonetheless decide whether Petitioner has satisfied his burden of showing a "substantial, not just conceivable, likelihood of a different result." Shinn v. Kayer, 141 S. Ct. 517, 523 (2020) (internal quotation marks omitted).  Petitioner argues that "[h]ad [Kadambi's] expert testimony and opinion been offered at trial, the outcome of this case likely would have been different because Dr. Kadambi's expert opinion goes [] directly to the primary issue of intent to defraud."[83]  But Petitioner does not compare Kadambi's testimony to the weight of the Government's evidence.  The court

---

[82](...continued)
and show that the testimony would have been favorable to a particular defense.'"  Id. at 18 (quoting Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009)).  This is a common stumbling block to ineffective assistance claims based on uncalled witnesses, but it is not applicable here since Petitioner identified Kadambi and his testimony, which goes to medical necessity and therefore intent to defraud and which plainly favors Petitioner.

[83]Petitioner's § 2255 Memorandum, Docket Entry No. 428, p. 29.

-23-

has reviewed Kadambi's testimony and analysis and the thorough and precise testimony of the four doctors called by the Government as experts, summarized above. The evidence that Petitioner frequently ordered medically unnecessary tests is overwhelming. Although Kadambi's testimony favors Petitioner, it would not have changed the totality of the evidence enough to raise a reasonable doubt as to Petitioner's guilt on any of the charges. Petitioner's ineffective assistance claim for not calling an expert witness therefore fails.

### 4.    Counsel's Cross-Examination of Agent Lammons

Petitioner argues that his trial counsel was ineffective in failing to adequately cross-examine Agent Lammons. Petitioner states that he "informed his trial attorney that Agent Lammons' colleague, Agent Christopher Ray, who also was involved in the investigation of this case, is the husband of Dr. Kelly Englund, [Petitioner]'s partner at North Cypress Regional Medical Center. [Petitioner] also informed his trial attorney that the investigation began as a result of [Petitioner]'s testifying on behalf of Aetna, an insurance company, against North Cypress Regional Medical Center in a civil cause of action."[84]

"Because decisions regarding cross-examination are strategic, they usually 'will not support an ineffective assistance claim.'" United States v. Bernard, 762 F.3d 467, 472 (5th Cir. 2014) (quoting Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002)).   For

---

[84]Id. at 30.

-24-

this court to second guess trial counsel's decision to focus his cross-examination on other topics, Petitioner must at least put forth a compelling area of questioning that was left out. Petitioner's vague conflict-of-interest allegation does not do so. Petitioner has not shown that his trial counsel's decision to prioritize different topics of cross-examination was ineffective.

## C.   **Prosecutorial Misconduct**

Petitioner argues that Government attorneys committed several acts of misconduct before and during the trial:

> (1) substantial government interference with Dr. Narang's ability to present Dr. Sidhu as a witness occurred because Dr. Sidhu was intimidated by the terms of his plea bargain, (2) unilateral and overt government action attributing to Dr. Sidhu's unavailability at trial, (3) bad faith expression to the defense that it will call Dr. Sidhu as a witness at trial, thus precluding the defense from subpoenaing Dr. Sidhu, and, (4) consciously eliciting testimony regarding Dr. Sidhu's guilty plea even after it explicitly informed that it was not going to call him as a witness.[85]

Petitioner also argues that the Government engaged in misconduct at sentencing by stating that "'the reason we got hold of Dr. Narang in the first place was because back in 2008 he was dealing with the Russians.'"[86]   Petitioner argues that this comment violated his First Amendment right of association and his due process rights.

The Government responds that each of these arguments is procedurally defaulted because Petitioner failed to raise them on

---

[85]Id. at 31-32.

[86]Id. at 33 (quoting Sentencing Transcript, Docket Entry No. 318, p. 48 lines 8-12).

-25-

direct appeal and that the sentencing statement caused no prejudice. Ineffective assistance of appellate counsel can constitute "cause" for procedurally defaulting a claim on direct appeal. Vickers v. Cockrell, 72 F. App'x 40, 46 (5th Cir. 2003). But Petitioner states only that "should this Court find any claims raised in the instant motion and memorandum procedurally defaulted, [Petitioner] submits that the reason would be the result of his trial and appellate attorneys' failures to raise them at the first available opportunity."[87] Because this conclusory statement is insufficient to establish ineffective assistance of appellate counsel, the court concludes that these arguments have been procedurally defaulted. Regarding the alleged misconduct at sentencing, the Government's vague reference to "the Russians" had no effect on this court's determination of Petitioner's sentence.

## D.   Cumulative Error

Petitioner argues that the cumulative effect of the asserted errors "caused his trial and sentencing to be fundamentally unfair."[88] Challenging a conviction based on cumulative error requires showing that "(1) the individual errors involved matters of constitutional dimensions rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process." Westley v. Johnson, 83

---

[87]Id. at 30-31.

[88]Id. at 33.

F.3d 714, 726 (5th Cir. 1996) (internal quotation marks omitted).
Even assuming without deciding that it was deficient performance
for Petitioner's trial counsel to not call any physician expert
witnesses, Petitioner could not establish prejudice.  Because the
court concludes that Petitioner has identified no other errors,
there can be no cumulative error.

## E.   Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states
that a district court "must issue or deny a certificate of
appealability when it enters a final order adverse to the
applicant."  A certificate of appealability will not issue unless
the applicant makes "a substantial showing of the denial of a
constitutional right," 28 U.S.C. § 2253(c)(2), which requires an
applicant to demonstrate "'that reasonable jurists would find the
district court's assessment of the constitutional claims debatable
or wrong.'"  Tennard v. Dretke, 124 S. Ct. 2562, 2565 (2004)
(quoting Slack v. McDaniel, 120 S. Ct. 1595, 1604 (2000)).  Under
that controlling standard this requires a petitioner to show "that
reasonable jurists could debate whether (or, for that matter, agree
that) the petition should have been resolved in a different manner
or that the issues presented were adequate to deserve encouragement
to proceed further."  Miller-El v. Cockrell, 123 S. Ct. 1029, 1039
(2003) (internal quotation marks omitted).  Where denial of relief
is based on procedural grounds, the petitioner must show not only
that "jurists of reason would find it debatable whether the

petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." <u>Slack,</u> 120 S. Ct. at 1599.

A district court may deny a certificate of appealability, <u>sua sponte,</u> without requiring further briefing or argument. <u>See Alexander v. Johnson,</u> 211 F.3d 895, 898 (5th Cir. 2000). The court concludes that reasonable jurists could not find any of the asserted claims meritorious, so a certificate of appealability will be denied.

## IV. <u>Conclusion and Order</u>

Petitioner has failed to establish, has raised on direct appeal, or has procedurally defaulted each of his claims challenging his conviction and sentence. The record conclusively shows that Petitioner is not entitled to any relief, so the court need not grant an evidentiary hearing. Petitioner's Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody (Docket Entry No. 427) is therefore **DENIED**. Because reasonable jurists could not find any of Petitioner's asserted claims meritorious, a certificate of appealability is **DENIED**.

**SIGNED** at Houston, Texas, on this 24th day of August, 2023.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

-28-